**Cong Nie, F0497**
**BANES HOREY BERMAN & MILLER, LLC**
**First Floor, Macaranas Building**
**4165 Beach Road, Garapan**
**P.O. Box 501969**
**Saipan, MP 96950**
**Tel: (670) 234-5684**
**Email: dnie@pacificlawyers.law**
*Attorneys for Defendant Hongjiang Yang*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL CASE No. 24-CR-00010 |
| | ) | |
| Plaintiff, | ) | MEMORANDUM OF LAW IN SUPPORT |
| | ) | OF DEFENDANT HONGJIANG YANG'S |
| vs. | ) | RENEWED MOTION FOR JUDGMENT OF |
| | ) | ACQUITTAL |
| HONGJIANG YANG, | ) | |
| | ) | Hearing: |
| Defendant. | ) | Time: |
| | ) | Judge: Hon. Ramona V. Manglona, C.J. |
| _____ | ) | |

## Table of Contents

I. Introduction .......................................................................................................  1

II. Legal Standard ....................................................................................................  1

III. Substantive Law ................................................................................................  2

    A.    The Legal Question of When a Transportee Is Guilty Must Be Answered First ...  2

    B.    Congress Intends to Treat Alien Transportees Differently from Transporters ......  3

        1.    When Initially Enacted, the Transportation Offense Lacked any Prohibition on an Alien Being a Passenger ................................................  3

        2.    Subsequent Amendments Further Strengthened Enforcement, but Still Left Alien Passengers Unpunished by Criminal Law ......................................  4

        3.    The Immigration Reform in 1986 Specifically Recognized That Removal Was a Sufficient Consequence for Aliens and, Again, Left Alien Passengers Unpunished ...............................................................................  4

    C.    The Buyer-Seller Distinction in Narcotics Offenses Is the Closest Analogy to the Alien-Transporter/Employer/Harborer Distinction under Immigration Law ........  6

    D.    An Equivalent of the Buyer-Seller Rule Should Be Applied in the Immigration Context ..................................................................................................................  7

    E.    Under the Buyer-Seller Rule, Pooling Resources Is Insufficient to Establish Conspiracy ..........................................................................................................  7

    F.    Under the Buyer-Seller Rule, One Cannot Simply Buy into a Conspiracy by Paying for Someone Else .....................................................................................  9

    G.    Under the Buyer-Seller Rule, Being the Contact/Referral Person Is Insufficient to Establish Conspiracy ..........................................................................................  9

    H.    The Buyer-Seller Rule Extends to Aiding and Abetting .....................................  11

IV. Argument ...........................................................................................................  11

    A.    Evidence Was Insufficient to Show Mr. Yang Had an Agreement with Other Travelling Aliens to Commit the Underlying Transportation Offense ...............  11

        1.    The Evidence Does Not Show Pooling ....................................................  11

        2.    Even Pooling Is Insufficient by Itself ......................................................  13

    B.    Evidence Was Insufficient to Show Mr. Yang Had an Agreement with Lady Hu to Transport His Wife ...............................................................................................  13

|   | 1. | Mr. Yang Did Not Buy into a Conspiracy ................................. 14 |
|---|---|---|
|   | 2. | Being the Contact Person for His Wife Is Insufficient as Well .............. 14 |
| C. | | Evidence Was Insufficient to Show Mr. Yang Intended to Facilitate, or Facilitated the Commission of a Transportation Offense ....................................... 15 |
| D. | | Evidence Was Insufficient to Show Mr. Yang Had an Intent to Further an Alien's Unlawful Presence in the U.S. ............................................................ 15 |

V. Conclusion .................................................................................................... 18

# Table of Authorities

**Cases**

*Arizona v. United States*, 567 U.S. 387 (2012) ................................................................ 5

*Jackson v. Virginia*, 443 U.S. 307 (1979) ..................................................................... 1

*Ocasio v. United States*, 578 U.S. 282 (2016) ........................................................... 2, 7

*United States v. 1982 Ford Pick-up*, 873 F.2d 947 (6th Cir. 1989) ................................. 15, 16, 17

*United States v. Colon*, 549 F.3d 565 (7th Cir. 2008) ...................................................... 10

*United States v. Dominguez*, 661 F.3d 1051 (11th Cir. 2011) ....................................... 18

*United States v. Evans*, 333 U.S. 483 (1948) ...................................................... 3, 10, 14

*United States v. Evans*, 970 F.2d 663 (10th Cir. 2024). ................................................ 10

*United States v. Garcia*, 400 F.3d 816 (9th Cir. 2005) ................................................... 15

*United States v. Gill*, 650 Fed. Appx. 420 (9th Cir. 2016) ........................................... 7, 13

*United States v. Herrera-Morales*, 1999 U.S. App. LEXIS 1191 (9th Cir. 1999) .................. 6

*United States v. Huebner*, 2011 U.S. Dist. LEXIS 4930 *;

    2011 WL 176820 (D. Mont. Jan. 19, 2011) ........................................................ 8

*United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1993) (en banc) .................................. 6

*United States v. Lennick*, 18 F.3d 814 (9th Cir. 1994) ..................................... 6, 7, 9, 14

*United States v. Loveland*, 825 F.3d 555 (9th Cir. 2016) ........................................... 9, 14

*United States v. McIntyre*, 836 F.2d 467 (10th Cir. 1987) .................................... 9, 10, 14

*United States v. Moreno*, 561 F.2d 1321 (9th Cir. 1977) ........................................... 15, 16

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc) ................................... 1

*United States v. Pressler*, 256 F.3d 144 (3d Cir. 2001) ........................................... 10, 14

*United States v. Salinas-Calderon*, 585 F. Supp. 599 (D. Kansas 1984) ........................ 16, 17

*United States v. Swiderski*, 548 F.2d 445 (2d. Cir. 1977) ............................................. 8

*United States v. Velasquez-Cruz*, 929 F.2d 420 (8th Cir. 1991) ............................................. 8, 13

**Statutes**

21 U.S.C. § 841 ......................................................................................................... 6

21 U.S.C. § 844 ......................................................................................................... 6

P.L. 82-483 (1952) .................................................................................................... 3

P.L. 95-412 (1978) .................................................................................................... 4

P.L. 95-582 (1978) .................................................................................................... 4

P.L. 97-116 (1981) .................................................................................................... 4

P.L. 99-603 (1986) .................................................................................................... 5

**Other Authorities**

Fed. R. Crim. P. 29 ................................................................................................... 1

H. Rep. 99-682(I) (1986) ....................................................................................... 5, 6

S. Rep. No. 82-1145 (1952) .................................................................................... 3, 4

*U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission on Immigration and Refugee Policy with Supplemental Views By Commissioners* (Mar. 1, 1981) .............................................................................. 4, 5

## I.      Introduction

The conduct of Defendant Hongjiang Yang ("Mr. Yang") is a far cry from what Congress intended to punish by criminal sanctions. Everything Mr. Yang did, he did it because he wanted to go to Guam himself with his wife, as passengers. To do what he did, he did not have to have an agreement with someone to commit a transportation offense. Nor did he have to have the intent to help someone commit a transportation offense. Nothing he did could lead a reasonable jury to elevate his status from a mere passenger to that of a co-conspirator or facilitator intending to further another alien's unlawful presence. To find otherwise will frustrate the entire scheme of immigration law and lead to far-reaching consequences.

## II.      Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure requires the Court, on a defendant's motion, to set aside a guilty verdict and enter an acquittal "of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(2). The Court's review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires a court to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. *See also United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc).

This standard requires a two-step inquiry:

> First, a . . . court must consider the evidence presented at trial in the light most favorable to the prosecution. . . . [And s]econd, after viewing the evidence in the light most favorable to the prosecution, the . . . court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt."

*Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 319) (emphasis in *Jackson*, final alteration in *Nevils*).

### III.    Substantive Law

**A.    The Legal Question of When a Transportee Is Guilty Must Be Answered First**

Before the Court evaluates the evidence presented at trial, a key legal question needs to be answered: in what circumstances can an alien passenger be prosecuted for conspiracy to transport or aiding and abetting transportation?

Previously, when the parties argued motions attacking an indictment's sufficiency, they all concluded that a passenger is not guilty just by consenting to be transported himself or herself. The legal principle supporting that conclusion and its implication is important to understand before the Court can rule on the sufficiency of the evidence.

Several years ago, a majority of the Supreme Court, in interpreting the Hobbs Act, which punishes extortion under color of official right, held that an extorter and an extortee can be found in a conspiracy together to commit extortion on the extortee himself "[u]nder longstanding principles of conspiracy law." *Ocasio v. United States*, 578 U.S. 282, 287 (2016). *But see id.* at 310-11 (Sotomayor, J. dissenting) (arguing the majority's "principles of conspiracy law" were merely specific to certain statutes). In so holding, the Supreme Court explained that such conspiracy did not apply to an extortee who "reluctantly" agreed to pay the extortor. *Id.* at 298. Should *Ocasio* be directly applicable in this case, conspiracy (or aiding and abetting) may be found simply upon evidence that an alien voluntarily asks to be transported (or aids his own transportation). No need to even talk about the pooling of money alleged by the government.

What sets this case and other transportation cases apart from *Ocasio* is a crucial distinction: The immigration statutes and statutory scheme, together with their legislative history, show an affirmative legislative policy to treat alien transportees, harborees, and employees differently from their transporters, harborers, and employers. Caselaw developing this distinction is scarce, probably because the government generally does not prosecute the aliens being

transported, harbored, or employed. But in the narcotics law context, where there is an affirmative legislative policy to treat drug buyers differently from drug sellers, caselaw is much more developed. Under such caselaw, neither pooling of resources, nor paying for someone else, nor being a contact/referral person in a joint transaction, is sufficient to establish conspiracy or aiding and abetting.

**B.    Congress Intends to Treat Alien Transportees Differently from Transporters**

    **1.    When Initially Enacted, the Transportation Offense Lacked Any Prohibition on an Alien Being a Passenger**

Prior to 1952, immigration law did not contain a provision specifically criminalizing domestic transportation of aliens. Back then, section 8 of the Immigration Act of 1917 provided:

> That any person, including the master, agent, owner, or consignee of any vessel, who shall bring into or land in the United States, by vessel or otherwise, or shall attempt, by himself or through another, to bring into or land in the United States, by vessel or otherwise, or shall conceal or harbor, or attempt to conceal or harbor, or assist or abet another to conceal or harbor in any place, including any building, vessel, railway car, conveyance, or vehicle, any alien not duly admitted by an immigrant inspector or not lawfully entitled to enter or to reside within the United States under the terms of this Act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding $2,000 and by imprisonment for a term not exceeding five years, for each and every alien so landed or brought in or attempted to be landed or brought in.

S. Rep. No. 82-1145 at 3 (1952). The text did not cover domestic transportation directly.

Based on the phrase "each and every alien so landed or brought in . . ." at the end of this section, the Supreme Court held that no penalty of imprisonment was imposed on concealing or harboring even though the conduct itself was prohibited. *See United States v. Evans*, 333 U.S. 483, 494-95 (1948). In reaction, in 1952, Congress passed an amendment titled "An act to assist in preventing aliens from entering or remaining in the United States illegally" to impose penalties on concealing and harboring. P.L. 82-483 (1952).

The senate report on this amendment stated that its purpose was also to "strengthen the law generally in preventing aliens from entering or remaining in the United States illegally." S.

3

Rep. No. 82-1145 at 2. The amendment added a provision to punish any person who:

> knowing that [an alien not duly admitted . . . or not lawfully entitled to reside to enter or reside within the United States] is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law.

*Id.* at 2-3. This was the origin of the domestic transportation offense. As enacted, it contained no provision criminalizing an alien for being transported within the United States.

### 2. Subsequent Amendments Further Strengthened Enforcement, but Still Left Alien Passengers Unpunished by Criminal Law

Following the 1952 amendments, Congress further amended the statute, to add and adjust a provision for seizure and forfeiture of any vessel, vehicle, or aircraft used in committing an offense (including a transportation offense). *See* P. L. 95-582, § 2 (1978); P.L. 97-116, § 12 (1981). With those amendments, the government could not only prosecute the smugglers and transporters but also take away their transportation means forever by express statutory authorization. Alien passengers were still left unpunished by criminal sanctions.

### 3. The Immigration Reform in 1986 Specifically Recognized That Removal Was a Sufficient Consequence for Aliens and, Again, Left Alien Passengers Unpunished

In 1978, Congress established the Select Commission on Immigration and Refugee Policy to make a comprehensive study of the immigration policy of the United States and offer administrative and legislative recommendations. Pub. L. No. 95-412, §4(a) (1978). The Commission's final report offered a comprehensive set of recommendations for immigration law reform that would, for the first time, punished employers for hiring undocumented aliens. *See U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission on Immigration and Refugee Policy with Supplemental Views By*

*Commissioners*, xv-xxxii (Mar. 1, 1981).[1] It did not recommend punishing alien passengers for being transported.

Even as to employment of undocumented aliens, the Commission did not recommend criminal penalties for alien employees. Some commissioners did advocate for imposing criminal liabilities on aliens unlawfully working in the U.S., but according to the report:

> Most Commissioners, however, argue that the imposition of penalties, in addition to that of deportation, is unnecessary and unworkable. By virtue of his/her presence in the United States, an undocumented/illegal alien is subject to deportation. To further penalize his/her employment will simply complicate and further slow an already overburdened legal process.

*Id.* at 66.

In 1986, Congress passed the Immigration Reform and Control Act of 1986 ("IRCA") to revise and reform the immigration laws. P.L. 99-603. It adopted the Commission's recommendation to criminalize employers but not alien employees, which led the Supreme Court to later conclude that "Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment," *Arizona v. United States*, 567 U.S. 387, 405 (2012).

As to the domestic transportation offense, the IRCA increased the penalties and reworded the statutory language into essentially its current version. *See* H. Rep. 99-682(I) at 66 (1986). That is, the IRCA criminalized any person who:

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

P.L. 99-603, § 112. The rewording removed the three-year limit on the alien's date of entry and broadened the scope to cover transporters who acted with "willful blindness." H. Rep. 99-682(I)

---

[1] *Available at* http://www.eric.ed.gov/PDFS/ED211612.pdf (last accessed on November 12, 2024).

at 66. But it still left alien passengers unpunished. Even though "[e]xtensive i[n]vestigative and legislative hearings on the problem of undocumented aliens were held," *id.* at 52, the House report on the IRCA did not mention any proposal or debate over criminalizing alien passengers.

**C.      The Buyer-Seller Distinction in Narcotics Offenses Is the Closest Analogy to the Alien-Transporter/Employer/Harborer Distinction under Immigration Law**

The undersigned counsel was unable to find a case directly addressing the implication of the alien-transporter/employer/harborer distinction for conspiracy or aiding and abetting charges.[2] Outside immigration law, the most comparable context is narcotics law, where Congress deliberately treats sellers and buyers of drugs differently, *compare* 21 U.S.C. § 841 (listing punishments for the distribution of controlled substances) *with id.* § 844 (listing punishments for simple possession of controlled substances). Courts have developed the so-called "buyer-seller rule." *See, e.g.*, *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994).

The rule was announced explicitly, perhaps for the first time, by the Seventh Circuit in *United States v. Lechuga*, 994 F.2d 346, 347-50 (7th Cir. 1993) (en banc). Under that rule, conspiracy to distribute drugs requires proof of an agreement to commit a crime other than the crime that consists of the sale between a seller and a buyer itself. *See* 18 F.3d at 819 ("Were the rule otherwise, every narcotics sale would constitute a conspiracy."). As explained in *Lechuga*, a buyer and a seller do not automatically form a conspiracy between the buyer agrees to buy while the seller agrees to sell. *See* 994 F.2d at 349.

In *Lennick*, the Ninth Circuit formally adopted the rule announced in *Lechuga*. 18 F.3d at 819. It applied the rule to reverse the conspiracy conviction of a defendant who distributed marijuana to dealers. *See id.* The Ninth Circuit reasoned that to show conspiracy, the government

---

[2] The hiring offense does not have its own conspiracy statute, but the government has used the general conspiracy statute under section 371 to prosecute defendants for hiring conspiracy, *see, e.g.*, *United States v. Herrera-Morales*, 1999 U.S. App. LEXIS 1191 *1 (9th Cir. 1999) (affirming conviction to employ illegal aliens in violation of section 371).

had to prove not only knowledge on the part of the defendant that the dealers would resell, but also an agreement between the defendant and the dealers that they would resell. *See id.*

**D.    An Equivalent of the Buyer-Seller Rule Should Be Applied in the Immigration Context**

The reasoning in *Lechuga* and *Lennick* is directly applicable in the immigration context to warrant a rule similar to the buyer-seller rule. Without such a rule, nothing will stand in the way of the government invoking "longstanding principles of conspiracy law" the way *Ocasio* did (and the way it is apparently doing in this case) to prosecute every single alien who asks to be transported, applies to work for a business that repeatedly hires undocumented aliens, or is willingly harbored by someone else. That is not what Congress intended the immigration law to do.

**E.    Under the Buyer-Seller Rule, Pooling Resources Is Insufficient to Establish Conspiracy**

The Ninth Circuit has held that pooling money on isolated occasions is insufficient to establish a conspiracy. *See United States v. Gill*, 650 Fed. Appx. 420, 421 (9th Cir. 2016). In *Gill*, a defendant was convicted after a jury trial of conspiracy to distribute methamphetamine. *Id.* The evidence showed that he and another person, who lived in his house for a few days, bought dealer-sized quantities of methamphetamine together once and discussed doing so another time. *Id.* The court reasoned that there was no evidence of agreement between the two to distribute jointly or in parallel and distinguished cases involving regular pooling of money and coordination. *Id.* It did not consider evidence of the joint purchase as evidence of a conspiracy between the defendant and his joint-buyer to distribute methamphetamine from their seller to them. *Id.*

In a district court case within the Ninth Circuit, a court stated in dicta that a defendant charged with conspiracy to distribute might be entitled to a jury instruction that multiple persons'

joint, simultaneous acquisition of drugs, with no distribution beyond sharing drugs among themselves, could not be the basis for a distribution offense or a conspiracy to distribute offense. *See United States v. Huebner*, 2011 U.S. Dist. LEXIS 4930 *1 n. 1; 2011 WL 176820 (D. Mont. Jan. 19, 2011). In that case, a defendant charged with conspiracy to possess with intent to distribute or distribute cocaine, and distribution of cocaine, asked the court to dismiss the indictment based on the so-called *Swiderski* rule. *See id.* That rule came from a 1977 decision in which the Second Circuit held that joint purchasers and possessors of drugs who shared the drugs between themselves as users may not be found guilty of distribution offenses. *United States v. Swiderski*, 548 F.2d 445, 447 (2d. Cir. 1977) (reasoning that joint purchasers did not serve a link in the chain of distribution).

The Ninth Circuit has yet to decide whether it will follow the *Swiderski* rule. But the court in *Huebner* evidently thought the Ninth Circuit would because it commented that at trial, the defendant might be entitled to a jury instruction based on *Swiderski*. *See Huebner*, 2011 U.S. Dist. LEXIS 4930 *1. The *Huebner* case eventually went to trial, and the court granted the defendant's motion for judgment of acquittal on the conspiracy charge after the close of evidence.

Those authorities show a legal principle that pooling money on isolated occasions is in itself insufficient to establish conspiracy. To establish conspiracy, there must be evidence of either a defendant playing a role that is substantively more involved than a resource-pooling buyer, or a defendant's intent to commit further illegal actions **_separate from_** the transaction in question.

This principle was implicitly recognized by the Eighth Circuit in *United States v. Velasquez-Cruz*, 929 F.2d 420, 424 (8th Cir. 1991), a case involving the substantive transportation offense. In that case, there was evidence that aliens pooled their money and bought a used car and van in order to relocate from Los Angeles to New York. *Id.* at 421. The Eighth

Circuit held that there was sufficient evidence to convict one of the aliens of the transportation offense. *Id.* at 424. That alien argued that her conduct was merely incidental to her own journey to New York, but the Eight Circuit pointed out evidence that she played a key role in buying the car, instructed other aliens to go to a safe house, and drove them on their way leaving Los Angeles.*Id.* The Eighth Circuit did not rely on evidence of pooling money to buy the car and the van. *Id.*

**F.    Under the Buyer-Seller Rule, One Cannot Simply Buy into a Conspiracy by Paying for Someone Else**

In the situation where a person (the payor) pays a supplier to get drugs for another person (the beneficiary), the Ninth Circuit has held that the payor and the supplier are not automatically guilty of conspiracy to distribute drugs to the beneficiary.

First, in *Lennick*, the Ninth Circuit reversed the conspiracy conviction of a defendant who distributed marijuana to dealers (in other words, the defendant was the supplier). *See* 18 F.3d at 819. Then, in *United States v. Loveland*, the Ninth Circuit reversed the conspiracy conviction of a defendant who repeatedly purchased dealer-quantities of drugs from a supplier group and resold the drugs (in other words, the defendant was the payor). *See* 825 F.3d 555, 562-63 (9th Cir. 2016). The Ninth Circuit reasoned that to the supplier group, the defendant could have flushed the drugs down the toilet for all they cared since they already had his money, and as for future sales, they had no hold on the defendant. *See id.* at 563 ("[The supplier's] stake in [the defendant's] enterprise was no different from a big-box store's stake in a convenience store's financial success from the resale of individually packaged peanuts purchased by the carton from the big-box store.").

**G.    Under the Buyer-Seller Rule, Being the Contact/Referral Person Is Insufficient to Establish Conspiracy**

In *United States v. McIntyre*, the Tenth Circuit reversed the conspiracy conviction of a

defendant who took a friend to the apartment of the defendant's drug source, received money from the friend, gave the friend's money and his own money to the source to buy drugs, picked up drugs, and then shared some of the drugs with the friend. *See* 836 F.2d 467, 469 (10th Cir. 1987). The Tenth Circuit pointed out that this evidence did not reveal a common goal of the defendant with the friend or the source to possess and distribute drugs, and that the defendant was merely sharing his purchases with his friends. *See id.* at 471.

In *United States v. Pressler*, the Third Circuit reversed the conspiracy to distribute heroin conviction of a drug dealer who referred other drug dealers to his source of supply. 256 F.3d 144, 157 (3d Cir. 2001). The Third Circuit used an analogy to illustrate what evidence was lacking:

> Imagine the owners of two convenience stores, X and Y. Both originally obtain soda for resale from various, unaffiliated wholesalers, but X discovers that wholesaler Z is easier to deal with. X then begins to buy all of her soda from Z (a sizeable amount) and informs Y that Z provides a superior source of supply. Y then begins to purchase a great deal of soda from Z as well. Just as this evidence, standing alone, would be insufficient to prove an agreement between X and Z to distribute soda to Y, the evidence in this case was not enough to support a conclusion that Shreffler and Caban conspired to distribute heroin to the Forsheys. It is common for people to tell their friends about a good store or restaurant. Though the Government proved that Shreffler was a very good customer to Caban, that he had recommended Caban to others, and that Caban benefitted from Shreffler's patronage, it did not show that Shreffler and Caban ever agreed to work together on anything.

*Id.* at 153-54.

In *United States v. Evans*, the Tenth Circuit reversed the conspiracy conviction of a defendant who lent scales to drug dealers to weigh drugs. *See* 970 F.2d 663, 673-74 (10th Cir. 2024). The Tenth Circuit reasoned that the act of lending scales "could have been merely a gratuitous favor or isolated act among friends." *Id.* at 673.

All those authorities show that just because a defendant did something for his friends or acquaintances that normal friends would do does not mean the defendant was forming a conspiracy with someone else to commit a crime.

### H.    The Buyer-Seller Rule Extends to Aiding and Abetting

In *United States v. Colon*, the Seventh Circuit extended the buyer-seller rule to aiding and abetting and reversed the conviction of a defendant who regularly bought dealer-quantities of drugs from suppliers and then redistributed the drugs to the defendant's own customers. *See* 549 F.3d 565, 567-569 (7th Cir. 2008). The Seventh Circuit illustrates its reasoning with the following analogy:

> Suppose you own and operate a store that sells women's clothing. Every month the same young woman buys a red dress from your store. You happen to know that she's a prostitute and wears the dress to signal her occupation to prospective customers. By selling her the dress at your normal price you assist her illegal activity, and probably you want the activity to succeed since if it fails she'll stop buying the dress and your income will be less. But you are not an aider and abettor of prostitution because if you refused to sell to her she would buy her red dress from another clothing store, one whose proprietor and staff didn't know her profession. . . . So you're not really helping her or promoting prostitution, as you would be if you recommended customers to her in exchange for a commission.

549 F.3d at 571.

### IV.    Argument

### A.    Evidence Was Insufficient to Show Mr. Yang Had an Agreement with Other Travelling Aliens to Commit the Underlying Transportation Offense

The government's main theory for conspiracy is that the Guam-going aliens, including Mr. Yang, were in a conspiracy to transport each other to Guam because they pooled their money to make the trip happen. There is insufficient evidence to prove pooling and even pooling would be insufficient.

#### 1.    The Evidence Does Not Show Pooling

The evidence at trial shows an ordinary transaction to buy boat passage to Guam. Mr. Yang was told to go to the World Mission Church, and there, he heard Lady Hu quote a price of $5,000 per person and ask for $500 down as a deposit. (*See* ECF No. 75 ¶¶ 6-12.) He paid $200 as the deposits for him and his wife on a later date. (*See id.* ¶¶ 16-19.) Lady Hu, upon receiving

the payment, said, "I'm finished with you five," just like a seller receiving a good-faith deposit from a buyer. (Trial Exh. 34(t).) When Lady Hu raised the deposit amount to $2,500 per person, he initially did not agree to pay but instead received a refund. (*See* ECF No. 75 ¶¶ 22-24.) But he changed his mind later and paid $5,000 as the deposits for him and his wife. (*See id.* ¶ 28.) There was no evidence of any communication between Mr. Yang and other passengers to coordinate the pooling of money from every single passenger before he made the payment.

Lady Hu's ledger of deposits showed a total of $19,500 received from 6 persons for 8 passengers (*see* Trial Exh. 36(t)), while the boat was purchased for $28,000 (*see* ECF No. ¶ 29). To a reasonable juror, that would mean Lady Hu came up with money from other sources. There was no evidence presented (for example, evidence of Ms. Hu's own financial ability to buy a boat, or evidence of boat availability and pricing) to show that but for Mr. Yang's payments, Lady Hu would not have been able to purchase a boat.

At the same time, there was no evidence that Lady Hu could not find other aliens wanting to go to Guam if Mr. Yang decided not to go, or that missing one particular passenger's payment was enough to render the trip unsuccessful. Nor was there evidence that subjectively, Mr. Yang, Lady Hu, or any other alien passenger actually thought they were pooling money. The payments they made before the date of the trip were constantly referred to as advance payments or deposits or payments to show "good faith" like a good faith down payment when buying a house. (*See* ECF No. 75 ¶¶ 12, 18; Trial Exh. 34(t) ("This represents our good faith, right?").). The $100 per person deposit was refunded when Mr. Yang decided initially to not pay the increased $2,500 per person deposit. (*See* ECF No. 75 ¶ 24.) There was no evidence that Lady Hu was reluctant to refund the money or that she told anyone that without Mr. Yang's payment, the trip would fail. Similarly, when Mr. Yang paid the $2,500 per person deposit, Lady Hu reassured Mr. Yang that if the boat failed to leave Saipan, she would refund the deposit. (Trial Exh. No. 22 ¶ D.)

After the boat purchase, the boat was in Lady Hu's control, not Mr. Yang's, and Mr. Yang was not involved at all with the purchase, registration with BMV, test driving, repairs, or hiring a crew. (*See* ECF No. 75 ¶¶ 29, 32-33, 42.) He did not even have a say in when to depart for Guam. (*See id.* ¶ 42.) Notice to depart was given to him only on the day of departure. (*See id.* ¶ 39; Trial Exh. 22 ¶ E.) Therefore, a reasonable juror could only conclude that Mr. Yang was merely buying passage to Guam for him and his wife instead of pooling money with others.

### 2.    Even Pooling Is Insufficient by Itself

Even if the evidence can be reasonably interpreted to mean pooling, such pooling would still be insufficient because it was an isolated occasion, and Mr. Yang and all the other passengers boarded the boat on the same day for the same trip. Undoubtedly, each alien passenger was interested in making it to Guam himself or herself. For a reasonable juror to conclude that they were interested in getting each other to Guam, there must be something more, and that something more is missing.

There was no evidence that Mr. Yang agreed or intended the boat to be re-used after the trip to transport other aliens to Guam. Unlike the defendant in *Velasquez-Cruz*, *see* 929 F.2d at 424, Mr. Yang did not play any organizational role. All he did was to go to Guam together with the other passengers. This is not a drug distribution chain where Mr. Yang somehow served as a middleman-dealer linking a supplier to a street-level distributor in a chain conspiracy. The only thing a reasonable juror would see is that Mr. Yang was simply a passenger going together with his wife and other passengers, just like in *Gill*, where the defendant and another person evidently pooled money to buy dealer-quantities of drugs and that fell short of showing a conspiracy, *see* 650 Fed. Appx. at 421.

### B.    Evidence Was Insufficient to Show Mr. Yang Had an Agreement with Lady Hu to Transport His Wife

An alternative theory Mr. Yang expects the government to argue is that Mr. Yang was in

a conspiracy with Lady Hu (or her hired help) to transport his wife . This theory falls short as well.

### 1.    Mr. Yang Did Not Buy into a Conspiracy

As discussed above, a person does not automatically form a conspiracy by paying for a third party. When a person pays a transporter to transport another person, for all the transporter cares, the beneficiary does not even have to show up for the trip so long as the transporter gets paid. In Mr. Yang's case, all Lady Hu cared was receiving the full price ($5,000 per person). So long as the price was paid in full, for all she cared, Mr. Yang's wife (or any other passenger) could have simply gotten off the boat before departure and remained in Saipan, or Mr. Yang could have boarded the boat alone without his wife. There was simply no evidence at trial that Lady Hu would abort the trip if a passenger did not show up. Like in *Lennick* and *Loveland*, where no agreement automatically formed between an upstream supplier and a payor even when the upstream supplier knew that the payor was reselling drugs, there was simply no agreement between Mr. Yang and Lady Hu to transport Mr. Yang's wife.

### 2.    Being the Contact Person for His Wife Is Insufficient as Well

Between Mr. Yang and his wife, Mr. Yang was the person who went to meet with Lady Hu and pay Lady Hu, before they eventually boarded the boat together. This fact still is not enough to show he was in a conspiracy to transport his wife.

Like what the defendants did in *McIntyre*, *Pressler*, and *Evans*, what Mr. Yang did was merely something that a normal person would do for a spouse or friends: Mr. Yang learned about a person organizing trips to Guam, he went to meet that person, and he paid money to that person for himself and his wife. Any husband in Mr. Yang's situation would do that for his wife if they both wanted to go to Guam. Nothing in the evidence suggests that his conduct was more than merely acts of gratuitous favor between spouses. For him to do those things, there was simply no

need for him to have any agreement with Lady Hu to transport his wife.

**C.    Evidence Was Insufficient to Show Mr. Yang Intended to Facilitate, or Facilitated the Commission of a Transportation Offense**

For the same reasons discussed above in relation to conspiracy, the evidence is insufficient to convict Mr. Yang of aiding and abetting. Aiding and abetting requires an intent to facilitate the commission of a transportation offense as well as conduct that aided, counseled, commanded, induced, or procured such commission. *See United States v. Garcia*, 400 F.3d 816, 818 n.2 (9th Cir. 2005) (noting that aiding and abetting requires specific intent). A person paying for passage does not by paying somehow aid and abet the transportation because, as discussed above, the person's intent is to buy passage, not to help the transporter or agree with the transporter in committing a crime.

Here, no reasonable jury could conclude that Mr. Yang's conduct somehow constituted facilitation, or that he intended to help Lady Hu in committing a transportation offense. The government presented no evidence to show that if Mr. Yang refused to pay Lady Hu, the trip would have failed for other passengers and knowing that, Mr. Yang intentionally helped Lady Hu, or that Mr. Yang somehow acted like a sub-tour agent who facilitated Lady Hu's selling passage to his wife. While Mr. Yang lent his phone to the captain (like other passengers did) to call for additional fuel while the boat was drifting in the ocean, all a reasonable jury could see was a passenger wanting to get to his destination (and safety) together with his wife onboard.

**D.    Evidence Was Insufficient to Show Mr. Yang Had an Intent to Further an Alien's Unlawful Presence in the U.S.**

Both the conspiracy and aiding and abetting charge require an intent to further an alien's unlawful presence in the U.S. Under *United States v. Moreno*, transportation by a defendant must have a direct or substantial relationship with the furtherance of an alien's unlawful presence in the U.S. *See* 561 F.2d 1321, 1323 (9th Cir. 1977).

In *Moreno*, the Ninth Circuit held that a foreman transporting workers as part of his employment did not act in furtherance of the workers' unlawful presence. *See id.*[3] That holding was criticized by the Sixth Circuit as wrongly decided under *Moreno*'s own test because, in the Sixth Circuit's view, transportation of aliens to their place of employment directly and substantially furthered their unlawful presence. *See United States v. 1982 Ford Pick-up*, 873 F.2d 947, 950 (6th Cir. 1989). But what the *Moreno* test really focuses on is the acts of a defendant from his point of view, not transportation in its abstract form. *See United States v. Salinas-Calderon*, 585 F. Supp. 599, 603 (D. Kansas 1984) (applying *Moreno* and focusing on "the defendant's act of transporting").

For example, in *Salinas-Calderon*, after a bench trial and applying the *Moreno* test, the court found that a defendant who gave a ride to his co-workers from Colorado to Florida did not act in furtherance his co-workers' unlawful presence. *Id.* at 601-602. In that case, the defendant was an undocumented alien working in some onion fields in Colorado. *Id.* at 601. There, he met six other undocumented Mexican nationals. *Id.* At some point, farm work became scarce in the area, and each of the aliens decided to move to Florida to work in the berry fields. *Id.* The defendant planned to drive there with his family (wife and daughter) in their pickup and agreed to give his co-workers a ride. *Id.* The aliens agreed to chip in for gas and food. *Id.* When the pickup was stopped by state highway patrol in Kansas, the defendant did not attempt to "conceal the passengers." 585 F. Supp. at 601.

On those facts, the court found that the *Moreno* test was not satisfied. *Id.* at 602-03. It pointed out that the defendant viewed the passengers as friends, co-workers and companions, not human cargo, and that the defendant's act of giving them a ride was "merely incidental to their

---

[3] The alien harboring offense used to have an exemption for employment of aliens. In *Moreno*, the Ninth Circuit clarified that it was not implying an automatic exemption from the transportation offense for an employer's transportation of its alien employees. *See* 561 F.2d at 1323.

existence [in the U.S.]." *Id.* at 603. The Sixth Circuit in *1982 Ford Pick-up* opined that *Salinas-Calderon* altered the *Moreno* test, but approved the test as applied by *Salinas-Calderon*. *See* 873 F.2d at 951 n.2. Using basically the same test as in *Salinas-Calderon*, the Sixth Circuit held that defendants who transported undocumented aliens from Texas to Kentucky to work in construction did not act in furtherance of their unlawful presence because their purpose was to "promote the well-being of friends and relatives by helping them obtain employment." 873 F.2d at 952.

The evidence in this case does not satisfy the *Moreno* test.

*First*, Mr. Yang's actions are merely incidental to furtherance of any alien's unlawful presence, if any, just like the defendant's conduct in *Salinas-Calderon* being incidental to compatriots' existence and the defendants' conduct in *1982 Ford Pick-up* being incidental to promotion of friends and relatives' well-being. Mr. Yang did not play an organizational role in the boat passage. Nor did he himself engage in any act that could be characterized as transportation (such as buying the boat, getting the boat to the dock, driving the boat, and assisting the captain with fueling the boat). He did not charge other passengers money. Nor did he stand to receive any benefit other than being transported himself. Mr. Yang did not act to conceal another passenger or tell other passengers to conceal themselves. No evidence was presented at trial that the boat was modified to conceal passengers. Had Mr. Yang purchased a boat and driven the boat himself to Guam with his wife onboard while also giving a ride to his compatriots and sharing expenses with them, he would have done exactly what the defendant in *Salinas-Calderon* did, *see* 585 F. Supp. at 601-02. But he did not even do that.

The government has argued that avoiding detection/pre-inspection on the way to Guam (including delay to call rescue) shows intent to further unlawful presence. That argument simply does not apply to an alien passenger whose trip itself depends on not being detected/pre-

17

inspected. At trial, the government presented testimony from a Customs and Border Protection officer about preventing aliens from travelling to Guam without authorization. Going by boat without being noticed was the only way for Mr. Yang to get to Guam. No reasonable jury is going to think that Mr. Yang avoided detection/pre-inspection, not because he wanted to actually get to Guam himself, but because he somehow intended to further another passenger's unlawful presence if and after they got to Guam. The court in *Salinas-Calderon* did not talk about it, but one can reasonably infer that the defendant there did not notify any immigration official of his ride to Florida and certainly was not planning to drive through an immigration checkpoint, or leave the United States altogether, get a visa, and then go through border inspection to re-enter.

*Second*, evidence presented at trial shows that Mr. Yang, his wife, and Ms. Weng wanted to go to Guam for work, and that they knew that other Chinese on Guam applied for asylum and received work authorization to work there. The government presented no evidence that Mr. Yang knew about other passengers' plans for when they got to Guam except his wife's. Nor did the government present evidence to show that Mr. Yang or his wife had no intent to apply for asylum after they arrived on Guam. This lack of evidence creates more than a reasonable doubt that Mr. Yang's wife was going to remain in Guam unlawfully as opposed to planning to legalize her stay through asylum, and that Mr. Yang knew or cared at all about the passengers' plans other than his wife's. *See United States v. Dominguez*, 661 F.3d 1051, 1061-62 (11th Cir. 2011) (transporting Cuban basketball players from Miami to Los Angeles with the plan to apply for asylum from Los Angeles did not satisfy the "in furtherance" element).

## V.    Conclusion

Suppose a home renovation company has a practice of hiring undocumented workers due to labor shortage. Its alien workers go to customers' homes and work together to finish projects. They socialize and voluntarily carpool with each other. Without them, the company will have no

workers and no business. In a sense, those workers pool their time, labor, skills, and cars. Even though everything they do is incidental to their existence, including being a normal co-worker and friend, they are guilty of alien employment and transportation conspiracies and aiding and abetting, if the government has its way in this case. Then suppose a worker does not work well with his co-workers and does not carpool with them, not because he thinks it is illegal to do so, but because he prefers to be a lone wolf. This worker is not guilty of conspiracy or aiding and abetting. That is the absurd consequence of the government's case.

The government has argued that it needs to be able to prosecute Mr. Yang this way because otherwise the CNMI visa-waiver program will somehow be in jeopardy. But Congress has given tools to the government. It can enforce the prohibition on employment of undocumented aliens on Guam to make it equally hard, if not harder, to find work on Guam. It can seek to remove aliens who land in Guam. For aliens who apply from Guam to USCIS for asylum, the government even knows who among them came from the CNMI, because it has entry records. Perhaps the government lacks the resources to do everything it can legally do, but that is not an excuse to prosecute aliens in a way that subverts the entire immigration scheme and common sense.

For those and all the foregoing reasons, the Court should set aside the guilty verdict on Count One and enter an acquittal.

Respectfully submitted this 14th day of November, 2024.

BANES HOREY BERMAN & MILLER, LLC
*Attorneys for Defendant Hongjiang Yang*

By: _____/s/ Cong Nie_____
        Cong Nie, F0497