F I L E D
Clerk
District Court
FEB 12 2025
for the Northern Mariana Islands
By _____
*JP*
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:24-cr-00010 |
| Plaintiff, | Case No. 1:24-cr-00011 |
| v. | |
| HONGJIANG YANG, | **MEMORANDUM DECISION DENYING DEFENDANT YANG'S AND GRANTING DEFENDANT WENG'S RENEWED MOTIONS FOR JUDGMENT OF ACQUITTAL** |
| Defendant. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| MEIFANG WENG, | |
| Defendant. | |

## I.    INTRODUCTION

Before the Court are Defendant Hongjiang Yang's and Defendant Meifang Weng's renewed Motions for Judgment of Acquittal. (Yang's Mot., ECF No. 91 *in* 1:24-cr-00010; Weng's Mot., ECF No. 94 *in* 1:24-cr-00011.) Yang and Weng were jointly tried with a third defendant, Defendant Xiulan Huang——Yang's wife. (Mins., ECF No. 57 *in* 1:24-cr-00010.) [1] At the conclusion of the presentation of the evidence by the Government, the Court denied all three defendants' motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (Mins., ECF No. 79 *in* 1:24-cr-00010.) The jury subsequently acquitted Huang of all charges (Verdict Form 4, ECF No. 84 *in* 1:24-cr-00010), but convicted both Yang and Weng on

---

[1] For convenience, the Court will reference documents that are identical in each of the Defendants' cases to the ECF Nos. in Yang's case.

the two charges within Count One of their superseding indictments——conspiracy and aiding and abetting transportation of illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (v)(I), and (v)(II). (Verdict Form 2–3; Yang's Redacted Indict., ECF No. 77-1 *in* 1:24-cr-00010; Weng's Redacted Indict., ECF No. 81-1 *in* 1:24-cr-00011.) The jury acquitted Yang and Weng on Count Two of their superseding indictments——conspiracy to defraud the United States in violation of 18 U.S.C. § 371. (Verdict Form 2–3.)

After the jury returned its verdict, Yang and Weng renewed their requests for judgment of acquittal as to their convictions of conspiracy and aiding and abetting transportation of illegal aliens. (Yang's Mot.; Weng's Mot.) The Government filed its oppositions to both motions. (Gov't Opp'n to Yang, ECF No. 95 *in* 1:24-cr-00010; Gov't Opp'n to Weng, ECF No. 95 *in* 1:24-cr-00011.) Yang and Weng both timely filed their replies. (Yang's Reply, ECF No. 96 *in* 1:24-cr-00010; Weng's Reply, ECF No. 96 *in* 1:24-cr-00011.) On February 5, 2025, the Court held a hearing on Yang's and Weng's motions, and after hearing the arguments of counsel and considering the applicable law and the record, the Court denied Yang's and granted Weng's renewed Motions for Judgment of Acquittal. (Mins., ECF No. 98 *in* 1:24-cr-00010.) The Court now issues this Memorandum Decision to memorialize its rationale.

## II.    PROCEDURAL BACKGROUND

A grand jury returned three separate superseding indictments against Yang, Weng, and Huang charging each with two counts: conspiracy and aiding and abetting transportation of illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (v)(I), and (v)(II) (Count 1); and conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count 2). (Yang's Superseding Indict., ECF No. 25 *in* 1:24-cr-00010; Weng's Superseding Indict., ECF No. 24 *in* 1:24- cr-00011; Huang's Superseding Indict., ECF No. 25 *in* 1:24-cr-00012.) Prior to trial and after a *Bruton* hearing, the Court ordered that the three separate cases be tried together as though brought in a

single indictment. (Mins., ECF No. 57 *in* 1:24-cr-00010.)  The Court held a three-day jury trial for the three Defendants, which resulted in the conviction of Yang and Weng as to Count One on both the conspiracy and aiding and abetting charges. (Verdict Form at 2–3.)

### III.    FACTUAL BACKGROUND

At trial, the Government presented the testimony of six witnesses and the Court received forty exhibits into evidence. (Ex. & Witness List, ECF No. 85-1 *in* 1:24-cr-00010). None of the Defendants presented any witnesses. Viewing the evidence in the light most favorable to the Government, the Government established the following relevant facts about Yang and Weng at trial.

In 2023, Yang and his wife Huang wanted to go to Guam to find better jobs, even though at the time neither had lawful status to travel to, work, or reside in Guam. (Stip. II ¶¶ 2, 4–5, ECF No. 75 *in* 1:24-cr-00010;[2] Gov. Ex. 22 ¶ B; Gov. Ex. 23 ¶ 3.) Weng had no legal status to be in the United States after July 7, 2017, and was not authorized to travel to or reside in Guam. (Stip. I ¶ 11.) In 2023, Weng wanted to go to Guam to join her boyfriend who lives legally in Guam and to look for work (Stip. II ¶ 1.)

Around June 2023, a Chinese individual told Yang that the individual knew a person who organized trips to Guam. (*Id.* ¶ 6.) The individual told Yang to go to the World Mission Church ("Church") on a date in June 2023 to meet the person who could get them to Guam. (*Id.* ¶ 7.) Yang went to the Church and was introduced to "pastor" Li, who introduced Yang to Ms. Hu Taitano. (*Id.* ¶¶ 8–10.) Also present at the Church meeting were Weng and approximately five other Chinese nationals. (*Id.* ¶ 11.) Yang's wife Huang was not present at that meeting and was

---

[2] At the parties' request, the stipulated facts (Stip. I, ECF No. 74 *in* 1:24-cr-00010; Stip. II) were read to the jurors and received into evidence after the Court provided a jury instruction on stipulations of fact. (Mins., ECF No. 79 *in* 1:24-cr-00010.) Written copies of the stipulated facts were provided to each juror for use during jury deliberation. (*Id.*)

unaware that Yang had attended the meeting. (*Id.*)  At the meeting, Hu Taitano told Yang, Weng, and the others that "she could arrange passage to Guam by boat for them for $5,000 U.S. dollars each, and that if they did not want to go, other people would go." (*Id.* ¶ 12.) Taitano said there would be as many as eight individuals paying to be transported to Guam. (*Id.*) Taitano asked for a $500 deposit per passenger, which neither Yang nor Weng paid because they did not trust Taitano. (*Id.* ¶¶ 12, 15, 18.)[3] Further, per Taitano's instruction, Yang chose Kun Gao——whom he and his wife had known before June 2023——as the go-between for himself and Taitano. (*Id.* ¶ 14.) After the Church meeting, Gao asked Taitano for a subsequent meeting, which took place around June 28, 2023 in Gao's car at a beach behind a hotel——Taitano, Gao, Yang, and Weng were present at this meeting. (*Id.* ¶¶ 16–17.) At the meeting, Taitano agreed to reduce the deposit cost for Gao, Yang, and Weng to $100 per person; Yang then paid Taitano $200 on behalf of himself and his wife, and Weng paid Taitano $100. (*Id.* ¶¶ 18–20.)[4]  Gao paid $200 for himself and his girlfriend, Wu. (*Id.* ¶ 19.)

After this second meeting, Gao told Yang that Taitano could not find a boat. (*Id.* ¶ 21.) Gao, Yang, and Weng then attended another meeting at the Church with other Chinese nationals present where Taitano announced: "if you don't want to go, it's okay. A lot of people still want

---

[3] Videos of portions of this meeting were also extracted from Weng's phone. The first video was recorded at Church in June 2023, and depicts two men of Asian heritage and the leg of a third individual. (Gov't Ex. 29.) One of the men was alleged co-conspirator Chongcai Dong. A translation of this video, and all evidence containing Chinese language, was admitted and labeled with the corresponding Exhibit number and the letter (t). In the instant video, Dong says in Chinese: "[f]or each item, make a budget for how much money we need according to which standards." (Gov't Ex. 29(t).) The second video also appears to have been recorded at Church, and shows Taitano speaking to a man off-camera. (Gov't Ex. 33.) The dialogue overlaps, but alleged co-conspirator pastor Li says "I only hope everything goes well and everybody gets there. I'm sure you will make money." (Gov't Ex. 33(t).)

[4] Government Exhibit 21 is a picture of Weng sitting in the backseat of a car with Taitano. In a handwritten note below the picture, Weng acknowledged the picture is of her handing Taitano $500 in cash on behalf of herself and four other individuals. (*Id.*; Gov't Ex. 21(t).) Government Exhibit 34 is a video extracted from Weng's phone and recorded around June 29, 2023. The video depicts Taitano sitting in the backseat of a car as she counts $500. After Taitano finishes counting the amount, she says, "[o]k. I'm finished with you five." (Gov't Ex. 34(t).) Special Agent Quintanilla's testimony at trial also established there were audio files exchanged between Weng and Taitano around June 29, 2023. (*See* Gov't Exs. 35; 35(t).)

to go. But if you want to go, you have to deposit $2,500 for each of you." (*Id.* ¶ 22.) Some Chinese nationals present at the meeting paid money to Taitano. (*Id*. ¶ 23.) However, Gao, Yang and Weng said they no longer wanted to travel to Guam*,* and so Taitano returned $500 to Gao, who in turn gave $200 to Yang and $100 to Weng. (*Id.* ¶ 24.) Despite the increase in the deposit amount, Gao's girlfriend Wu still wanted to go to Guam. (*Id.* ¶ 25.) Wu herself tried to contact Taitano on WeChat, and when Taitano did not reply, she contacted pastor Li who told her to meet at the Church the next day. (*Id.* ¶ 26.) Subsequently, Gao told Yang that Taitano could still arrange passage but she had to first buy a boat. *(Id.* ¶ 27.) Gao told Yang to meet at the Church the next day. (*Id*.) The next day, Yang went with his wife Huang to the Church, but Huang stayed in the car and did not hear what transpired at the meeting. (*Id*. ¶ 28.) At the Church, Yang gave Taitano $5,000 "as the advance payment for both himself and [his wife,]" knowing that Taitano "might use all or a part of the money to buy a boat." (*Id.* ¶ 28; Gov't Ex. 22 ¶ D.)

The evidence specific to Weng included two videos and a photo. Two videos were extracted from Weng's phone depicting an unknown man of Asian heritage and a small boat on a trailer. (Gov't Exs. 26–27.) In the second video, a woman's voice is heard saying "[l]ook at this boat" in Chinese. (Gov't Ex. 27(t).) The parties stipulated and the jury was informed that both videos were "changed in some way on June 22, 2023, but the date the videos were created could not be determined." (Stip. No. 3.) The Court also admitted Government Exhibit 28, a picture extracted from Weng's phone and taken around June 23, 2023 of her wearing a life jacket with a merchandise tag on it in a store. It appears that another person used Weng's phone to take the picture. (*See id.*)

On July 3, 2023, Taitano, Lee Jesse Omar Reyes, and Reyes's brother-in-law met with the owner of a 1996, 22-foot Four Winns, model 220 Horizon fiberglass boat, and paid the owner $28,000 to purchase the vessel. (Stip. II ¶ 29; *see* Stip. I ¶ 20.) Taitano and Reyes arranged to

have the vessel registered in the brother-in-law's name because Reyes did not have a driver's license. (Stip. II ¶ 30.) The brother-in-law registered the vessel under his name on July 5, 2023, and then Reyes went to the seller's residence and retrieved the vessel. (*Id.* ¶ 31.) Reyes used the vessel several times and found out that it had some mechanical issues. (*Id.* ¶ 32.) Reyes told Taitano about the mechanical issues. (*Id.*) Taitano purchased several boat parts for the vessel, and also gave Reyes money to buy a flare gun, fire extinguisher, and safety ring for the vessel. (*Id.*) Neither Reyes, Taitano, nor any other person ever informed Yang, Huang, or Weng about mechanical issues with the boat. (*Id.* ¶ 33.) Although Reyes informed Taitano on July 9, 2023 that the vessel was operating mechanically well, he did not believe the vessel could make a trip to the island of Rota, much less all the way to Guam; so, Reyes hired Ramon Jose Quitano Sablan to drive the vessel to take Huang, Yang, Weng, Wu, Gao, Kun, Dong, Tang, and Li to Guam. (*Id.* ¶¶ 34–35; *see* Stip. I ¶ 19.)

In the early evening of July 9, 2023, pastor Li contacted Weng to "go to the dock immediately" because the vessel was departing for Guam. (Stip. II ¶ 37.) Weng then called a taxi and went to the dock. (*Id.* ¶ 38.) Weng boarded the boat "with the intention to travel illegally to Guam." (*Id.* ¶ 46; Gov't Ex. 20 ¶ B.) On the boat, Weng paid Taitano $2,500.[5] (Stip. II ¶ 51.) Also on July 9, 2023 at approximately 7:00 p.m., Gao contacted Yang and "said they should go to the dock immediately" because the vessel was departing for Guam. (*Id.* ¶ 39.) Yang then rode in a taxi with his wife Huang, Gao, and Gao's girlfriend to the dock——they were the last four people to board the boat to Guam. (*Id.* ¶¶ 40–42.) Yang and his wife boarded the boat both knowing it was going to Guam. (*Id.* ¶¶ 44–45.) Yang knew that his wife's immigration status did

---

[5] Government Exhibit 36 is a one-page handwritten note provided by Dong showing amounts of money next to individuals' names written in Chinese——Weng's name is listed next to an amount of $2,500 (Gov't Ex. 36(t)). This note, within a notebook, also appears in Government Exhibit 37——a recording of a video from Dong's phone wherein Taitano is seen holding stacks of money and talking about the sum of money in relation to eight people. (*See* Gov't Ex. 37(t).) Yang and other Chinese individuals also appear in the video. (Gov't Ex. 37.)

not allow her to travel to or reside in Guam. (*Id.* ¶ 47.) Once on board, Yang paid Taitano the remaining balance of $5,000 on behalf of himself and his wife. (*Id.* ¶ 50.)

At approximately 8:00 p.m., Sablan captained the vessel assisted by Maverick Ryan Iguel Marlik; Sablan drove from Smiling Cove Marina, Saipan and then turned south toward Guam with Yang, Huang, Gao, Wu, Gao and four other Chinese nationals on board. (*Id.* ¶ 56; *see* Stip. I ¶ 18.) At about 1:00 a.m. on July 10, 2023, Sablan used his mobile phone to call Reyes and alert him that the vessel was low on fuel. (Stip. II ¶ 57.) The boat ran out of fuel at about 2:30 a.m. near the island of Rota. (*Id.* ¶ 58.) At approximately 7:30 a.m., Sablan tried using the cellphones of the Chinese nationals to make calls, but most cellphones had no signal. (*Id.* ¶ 59.) Sablan eventually used Yang's cellphone to call Taitano to arrange for delivery of additional fuel. (*Id.*) About three hours later at approximately 10:00 a.m., Taitano attempted to obtain a second boat and bring fuel to the boat, but the delivery did not succeed. (*Id.* ¶ 60.) At some point on board the vessel, Sablan fired a rescue flare, but there was no immediate response. (*Id.* ¶ 62.) At approximately 5:00 p.m. on July 10, 2023, Sablan turned on the radio and called for help. (*Id.* ¶ 63.) A search operation ensued involving aircraft from the French and Canadian militaries, the U.S. Coast Guard, and a boat from the Rota Department of Public Safety Boating Safety unit. (*Id.* ¶ 64.) After an aircraft located the vessel, a U.S. Navy helicopter began a rescue operation at approximately 12:00 a.m. on July 11, 2023, and the eleven individuals on the boat were loaded into the U.S. Navy helicopter and taken to the island of Rota. (*Id.* ¶ 67.) Photos of the vessel used, and of the passengers' carry-on luggage and personal belongings were received into evidence. (Gov't Exs. 1–19.)

## IV.    LEGAL STANDARD

Rule 29 of the Federal Rules of Criminal Procedure requires the court, on a defendant's motion, to set aside a guilty verdict and enter an acquittal "of any offense for which the evidence

is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(2). Under *Jackson v. Virginia*, a court is required to determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979). This standard requires a two-step inquiry:

> First, a . . . court must consider the evidence presented at trial in the light most favorable to the prosecution. . . . Second, after viewing the evidence in the light most favorable to the prosecution, the . . . court must determine whether this evidence, so viewed, is adequate to allow "*any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt."

*United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting *Jackson*, 443 U.S. at 319) (internal alteration omitted).

## V.    DISCUSSION

The Government presented sufficient evidence for a reasonable juror to find each element of the offenses of conspiracy and aiding and abetting transportation of illegal aliens as to Yang. However, the Government failed to sufficiently prove the offenses as to Weng because the evidence was insufficient to support that Weng had an agreement with another individual to transport an alien other than herself.

### A.    Conspiracy to transport in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (v)(I)

To prove someone guilty of conspiracy to transport aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (v)(I), the government must prove "1) there was an agreement between two or more persons to commit [a violation of 8 U.S.C. § 1324(a)(1)(A)(ii)] . . . ; and 2) defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it." *United States v. Benitez-Augustin*, 61 F. App'x. 337, 340 (9th Cir. 2003) (unpublished); *see* Ninth Circuit Manual of Model Criminal Jury Instructions ("Model Instr.") 11.1. Further, the Government must also prove that 3) "the defendant must have the intent necessary to commit transportation of illegal aliens, which requires intent to further the illegal

aliens' presence in the United States." (Decision and Order 7.) *See United States v. Colwell*, 7 F. App'x 555, 557 (9th Cir. 2001) (unpublished); *United States v. Torralba-Mendia*, 784 F.3d 652, 663 (9th Cir. 2015).

### 1. Agreement to transport aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii)

A person violates 8 U.S.C. § 1324(a)(1)(A)(ii)[6] if:

First, the person knowingly transports or moves, within the United States, an alien other than the person himself/herself;

Second, the transported alien is in the United States unlawfully;

Third, the person acts while knowing or acts in reckless disregard of the fact that the transported alien is not lawfully in the United States; and

Fourth, the person acts intending to help the transported alien remain in the United States illegally.

(Final Jury Instr. 8, ECF No. 81 *in* 1:24-cr-00010.) *See* Model Instr. 7.2. "To prove an agreement to commit a crime, . . . the government . . . must prove that the defendant agreed with at least one other person to commit that crime." Model Instr. 11.1, cmt. (citing *United States v. Loveland*, 825 F.3d 555 (9th Cir. 2016)). The parties recognize that the question of whether "an alien whose only act is to pay someone to transport themselves" is "guilty of conspiring to transport an illegal alien" remains undecided in the Ninth Circuit. (Gov't Opp'n to Yang 2; Yang's Reply 1; *see* Weng's Mot. 4.) As demonstrated by the final jury instructions, the Court concludes that to satisfy the agreement element for the conspiracy to transport offense, the Government must prove that a defendant intended to further the unlawful presence of an alien *other than himself/herself*. (*See* Final Jury Instr. 1.) *See also* U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, Gᴜɪᴅᴇʟɪɴᴇꜱ Mᴀɴᴜᴀʟ ("USSG") § 2L1.1,

---

[6] Section 1324(a)(1)(A)(ii) punishes any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law."

comment. (n.1) (Nov. 2024) (number of unlawful aliens smuggled, transported, or harbored does not include defendant).

To support their argument that neither of them had an agreement with anyone to transport illegal aliens, Yang and Weng rely on a number of cases in the narcotics law context which apply the "buyer-seller" rule. (*See* Yang's Mot. 11–15; Weng's Mot. 4; Weng's Reply 1.) Under the buyer-seller rule, conspiracy to distribute drugs requires proof of an agreement to commit a crime other than the crime that consists of the initial sale between the seller and the buyer. *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994) (internal quotations and citation omitted). "Were the rule otherwise, every narcotics sale would constitute a conspiracy." *Id.* Yang argues that the Court should apply the buyer-seller rule to the immigration law context and find that Yang did not form a conspiracy with anyone because pooling resources, paying for someone else, and being the contact person are all insufficient to establish the requisite agreement under the buyer-seller rule. (Yang's Mot. 11–15.) The Government's oppositions to both Yang and Weng's Motions were silent as to the application of the buyer-seller rule; however, during the hearing, the Government argued that the buyer-seller rule is unique to the narcotics law context because it was created to treat individuals with drug addictions——buyers——differently from sellers.

No court has discussed or applied the buyer-seller rule in deciding whether an agreement to transport aliens was sufficiently established when the defendant is a transportee. Given the lack of case law discussing the conspiratorial liability of aliens who are transported, the Court considers the cases regarding the buyer-seller rule in its analysis, without finding per se that the rule is applicable to the immigration context as a matter of law. *Cf. United States v. Medina* (*Medina I*), CR 22-13-M-DLC, 2022 WL 17082148, at *9 (D. Mont. Nov. 8, 2022) (considering *Sanchez-Mata*, a narcotics law case, in deciding whether defendant sufficiently assisted principal

to support conviction for aiding and abetting transportation of aliens), *aff'd*, No. 22-30206, 2023 WL 8797503 (9th Cir. Dec. 8, 2023).

The facts here, viewed in the light most favorable to the Government, are sufficient to support that Yang had an agreement with Taitano to transport his wife Huang, but are insufficient to support that Weng had an agreement with Taitano or anyone else to transport another illegal alien other than herself.

### a.  Yang had an agreement with Taitano to transport his wife.

Yang did not simply purchase or pool his money with others to secure *his own* passage to Guam. Rather, Yang attended meetings with the intent to gain transport for both himself and his wife to Guam; attended a meeting with Gao, Weng, and Taitano where he successfully convinced Taitano to agree to lower the cost of the deposit from $500 to $100 per passenger for both himself and his wife; made depository payments for both himself and his wife on two occasions, knowing that Taitano might use all or part of the amount he paid Taitano on the second occasion to buy a boat; paid Taitano the remaining balance of $5,000 for both himself and his wife once he boarded the boat; and allowed the boat captain to use his phone to call co-conspirators when the boat had run out of fuel rather than call law enforcement.

The evidence here is sufficient to support the jury's finding that Yang had an agreement with Taitano to transport his wife. In *United States v. Loveland*, a narcotics law case, the court summarized that "when deciding if there is sufficient evidence of an agreement, [a court] look[s] for 'evidence of a prolonged and active pursued course of sales coupled with the seller's knowledge of *and a shared stake* in the buyer's illegal venture.'" 825 F.3d 555, 560 (9th Cir. 2016) (quoting *United States v. Ramirez*, 714 F.3d 1134, 1140 (9th Cir. 2013)). Although there were no repeated sales between Yang and Taitano here, Yang met with Taitano multiple times to arrange his and his wife's boat passage from Saipan to Guam. Taitano had knowledge of Yang's

intent for his wife to travel to Guam, and a reasonable juror could have found that Taitano had a shared stake in Yang's wife's travel to Guam. After the boat left Saipan and ran out of fuel near the island of Rota, Taitano continued taking action to help the boat complete its journey to Guam; after the boat captain called her with Yang's phone, she made an unsuccessful attempt to deliver fuel to the boat. Unlike *United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir. 1987), which Yang relies upon, a reasonable juror could have found that Yang was not merely sharing his purchase of transportation with his wife, but rather that he possessed the "common goal" of transporting his wife with Taitano.

**b. Weng did not have an agreement with another person to transport another alien.**

Unlike Yang, Weng acted solely to secure her own passage to Guam. While there was ample evidence to support that Weng had an agreement with Taitano to transport herself, there was insufficient evidence to support that she agreed with Taitano to transport another alien. Viewing the evidence in the light most favorable to the Government, Weng attended meetings where other Chinese nationals also seeking passage to Guam were present; attended a meeting with Gao, Yang, and Taitano where Taitano agreed to lower the cost of the deposit; and made depository payments on two occasions. Although there was no direct evidence to show that Weng knew Taitano might use all or part of her deposits to buy a boat to make the journey possible—the jury could have reasonably inferred as such. Weng was present at the Church when Taitano discussed significantly increasing the deposit amount. However, all these actions are entirely consistent with Weng's agreement with Taitano to transport herself, rather than any other alien, to Guam.

The Government points to additional evidence extracted from Weng's phone: 1) the videos of her looking at a small boat on a trailer; 2) the picture of her wearing a life jacket while at a store; and 3) the picture of her handing Taitano $500 in the backseat of a car. These pieces of

evidence also support the reasonable inference that Weng merely wanted to ensure her own, personal, safe passage to Guam. There is no evidence of other alien passengers wearing the same life jackets as hers, or any life jackets at all. The boat in the video is not the same boat actually purchased and used, and the female voice in the video was never identified as Taitano or anyone assisting her. Further, while the picture of Weng in the car demonstrates that she physically handed $500 to Taitano, other evidence contextualizes her actual share of and interest in the $500 payment. First, Yang and Gao were also present in the car at the time Weng handed Taitano $500; Yang paid $200 for himself and his wife, Gao paid $200 for himself and his girlfriend, and Weng paid $100 only for herself. Further, because Weng was refunded only $100 when she initially withdrew from the agreement, it is clear that Weng's $100 share of the $500 payment was made only for herself. Even viewed in the light most favorable to the Government, all the evidence taken together falls short of establishing beyond a reasonable doubt that Weng and Taitano had an agreement to transport another alien.

The Government also argues that Weng had an agreement with the other passengers to transport them. Based on the evidence admitted at trial, this argument falls short. The Government characterizes the scheme to transport aliens as one that began with and was driven by the alien passengers. However, the facts in this case demonstrate that an unknown individual referred the potential passengers to the Church, and it was pastor Li who introduced at least Yang to Taitano. At the first Church meeting, Taitano told Yang, Weng, and the other Chinese nationals present that she could arrange passage to Guam by boat for $5,000 per passenger and "that if they did not want to go, other people would go." Further, at a second meeting inside Gao's car, Yang, Weng and Gao successfully negotiated with Taitano about lowering the price of the deposit rather than negotiated with other passengers. When Taitano raised the cost of the deposit to $2,500 at a subsequent Church meeting, Taitano again told Yang, Weng, and the other Chinese nationals

present "if you don't want to go, it's okay. A lot of people still want to go." Indeed, after that second meeting, both Yang and Weng decided that they no longer wanted to make the passage, and there is no evidence that the trip was called off or altered in any way as a result of their withdrawal. The evidence admitted at trial establishes that, in relation to one another, the alien passengers in this case wanted to transport himself or herself, rather than one another. *See United States v. Alvarez-Moreno*, No. CR-17-01019-001-TUC-JAS, 2018 WL 1071192, at *3 (D. Ariz. Feb. 23, 2018) (finding insufficient evidence of agreement for conspiracy to transport based on circumstantial evidence of driving in tandem and expert testimony about how smuggling operations function); *cf. United States v. Gill*, 650 F. App'x 420, 422 (9th Cir. 2016) (pooling money to buy dealer-sized quantities of methamphetamine once and discussing doing so another time insufficient to establish conspiracy to distribute).

### 2.   Yang became a member of the conspiracy.

"Once the government has established the existence of a conspiracy, 'evidence of only a slight connection is necessary to support a conviction of knowing participation in that conspiracy.'" *Torralba-Mendia*, 784 F.3d at 663–64 (quoting *United States v. Sanchez-Mata*, 925 F.2d 1166, 1167 (9th Cir. 1991)). "A 'slight connection means that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details.'" *Id.* (quoting *United States v. Herrera–Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001)). "But it does require more than a '[m]ere casual association with conspiring people.'" *Id.* (quoting *United States v. Estrada–Macias*, 218 F.3d 1064, 1066 (9th Cir. 2000)).

Yang and Taitano had an agreement to transport another alien——Yang's wife, and Yang knowingly participated in the conspiracy by meeting with Taitano on multiple occasions; making payments to her on multiple occasions; and allowing the boat captain to use his phone to call Taitano rather than law enforcement once the boat ran out of fuel. On the other hand, because

14

Weng did not have an agreement with anyone to transport another alien other than herself, Weng did not knowingly participate in a conspiracy to transport another alien.

### 3.  Intent to further an alien's unlawful presence

The Ninth Circuit has detailed the requirements of the "in furtherance of" element in relation to the substantive transportation offense, 8 U.S.C. § 1324(a)(1)(A)(ii). "[T]here must be a direct or substantial relationship between [the] transportation [of aliens] and its furtherance of the alien's presence in the United States." *United States v. Moreno*, 561 F.2d 1321, 1323 (9th Cir. 1977). "The 'in furtherance of' element is not satisfied if a defendant's transportation of an alien is 'only incidentally connected to' the alien's illegal entry or continued illegal presence. *United States v. Barajas-Chavez*, 162 F.3d 1285, 1288 (10th Cir. 1999) (quoting *Moreno*, 561 F.2d at 1322). "This determination is fact specific and takes into account time, place, distance and overall impact of the transportation." *United States v. Cruz-Grijalva*, No. CR 11-02783-TUC-JGZ, 2012 WL 5381442, at *7 (D. Ariz. Nov. 1, 2012) (citing *Moreno*, 561 F.2d at 1323). "The Government need not prove by direct evidence a defendant's intent to further the presence of an illegal alien." *United States v. Hernandez-Guardado*, 228 F.3d 1017, 1023 (9th Cir. 2000) (internal citation omitted).

The parties have not cited to nor has the Court found any Ninth Circuit or district court decision that discusses the "in furtherance of" element in relation to the transportation offense when the defendant is a transported illegal alien. Other courts that have been presented with this argument in comparable contexts involve the transportation of other aliens. In *United States v. Velasquez-Cruz*, the Eighth Circuit applied the Ninth Circuit's *Moreno* test for the "in furtherance of" element and found that the defendant's conviction for willful transportation of illegal aliens was supported by sufficient evidence. 929 F.2d 420, 422–23 (8th Cir. 1991). On appeal, the defendant had argued that "her transportation of aliens was merely incidental to her own journey

. . . because she merely 'car-pooled' with the other aliens rather than playing an organizational role." *Id.* at 423. The defendant argued that she had thus not acted in furtherance of the aliens' unlawful presence under the *Moreno* test. *Id.* The court found "substantial evidence support[ed] the jury's conclusion that defendant organized the aliens' journey, rather than merely participating in it as a 'car-pooler'" because: 1) "there was evidence that defendant played a key role in buying the car;" 2) "defendant apparently met the other aliens in a 'safe house';" and 3) multiple witnesses testified that defendant was the only person they saw driving the car. *Id.* at 424.

In *United States v. Salinas-Calderon*, the defendant——an individual who was not lawfully admitted or present in the United States——was charged with the offense of unlawful transportation of aliens. 585 F. Supp. 599, 601 (D. Kan. 1984).[7] The district court in *Salinas-Calderon* applied *Moreno* and granted the defendant's motion for judgment of acquittal because "the defendant's act of giving the aliens a ride . . . was not directly and substantially related to their illegal presence here." *Id.* at 603. In *Salinas-Calderon*, the Government established the following facts:

> [The defendant] knew his passengers for about four months prior to their trip, that they worked together, and that they were on friendly terms with each other. The defendant and the aliens individually planned to go [from Colorado] to Florida; the defendant planned to drive his family in their pickup, and he agreed to give his co-workers a ride. They shared the expense of the trip; the defendant was not compensated in any way. The vehicle was not specifically designed to conceal the passengers, and there was no attempt to conceal or harbor the passengers.

*Id.* at 602. In light of this evidence, the district court could not find "beyond a reasonable doubt that the defendant acted in willful furtherance of the aliens' illegal presence in the United States." *Id.* Of note to the court was the fact that there was "no concealment or harboring . . . . While concealment or harboring are not requisites of a transportation violation, these factors are

---

[7] *Salinas-Calderon* may have effectively been overruled by the Tenth Circuit in *Barajas-Chavez*, 162 F.3d 1285. However, because *Barajas-Chavez* rejected the Ninth Circuit's *Moreno* test and *Salinas-Calderon* applied *Moreno*, the Court finds that the analysis in *Salinas-Calderon* holds persuasive value.

16

indicative of whether the defendant acted willfully in furtherance of the aliens' illegality." *Id.* The court further noted that the defendant was not compensated and his passengers were "friends, co-workers and companions—not cargo." *Id.* Lastly, the court articulated that "[t]here must be a distinction between acts performed with the purpose of supporting or promoting an alien's illegal conduct, and acts which are incidental to or which merely permit an individual to maintain his existence, albeit his existence occurs in this country and he is not duly admitted here." *Id.*

Ninth Circuit courts have not detailed the evidence sufficient to support the requisite intent——the intent to further aliens' unlawful presence——for the conspiracy to transport charge under 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (v)(I). In the one Ninth Circuit court case that discusses the issue, the Ninth Circuit upheld the defendant's conviction for conspiracy to transport and found the defendant had the sufficient intent based on evidence that "[the defendant] had engaged in similar prior conduct with the same participants, which tended to show a course of conduct consistent with conspiracy." *Colwell*, 7 F. App'x at 557. Given that the Government must prove intent to further an alien's unlawful presence in order to support a conspiracy to transport conviction, *see id.*, the Government must establish that Defendants Yang and Weng had sufficient intent under *Moreno*. That is, there must be a "direct or substantial relationship" between Defendants' actions and the furtherance of another alien's illegal entry or illegal presence——it is insufficient if Defendants' actions are only "incidentally connected to the alien's illegal entry or continued illegal presence." *Moreno*, 561 F.2d at 1323. Relatedly, the Court finds *Velasquez-Cruz* and *Salinas-Calderon* persuasive in their application of *Moreno* to fact patterns similar to the cases presently before the Court. In conducting the analysis of whether Yang and Weng possessed the sufficient intent to support their conspiracy convictions, the Court will "consider

any and all relevant evidence."[8] *See Barajas-Chavez*, 162 F.3d at 1289; *Cruz-Grijalva*, 2012 WL 5381442, at *7 (citing *Moreno*, 561 F.2d at 1323). Further, as the Court has already concluded, to satisfy the "in furtherance of" element for transportation offenses, the Government must prove that a defendant who is unlawfully present in the United States intended to further the unlawful presence of *another* alien. (*See* Final Jury Instr. 1.) *See supra* § V.A.1; *see also* USSG. § 2L1.1, comment. (n.1) (number of unlawful aliens smuggled, transported, or harbored does not include defendant).

### a. Yang intended to further another alien's unlawful presence.

Yang attended meetings where other Chinese nationals seeking passage to Guam were present; attended a meeting with Gao, Weng, and Taitano where Taitano agreed to lower the cost of the deposit; and made depository payments on behalf of himself and his wife on two occasions, knowing that Taitano might use all or part of the amount Yang paid Taitano on the second occasion to buy a boat. These actions are consistent with Yang's intent for his wife and himself to travel to Guam; however, this evidence does not establish beyond a reasonable doubt that Yang intended for an alien *other than his wife or himself* to travel to Guam. While Yang's actions to arrange for his own and his wife's travels might have increased the likelihood that the other aliens could travel to Guam, his actions are insufficient to establish that he intended to further these other aliens' unlawful presence. *See Salinas-Calderon*, 585 F. Supp. at 602 (finding insufficient intent to further the aliens' illegal presence when defendant and other aliens individually planned to go to Florida, defendant agreed to give co-workers a ride, they shared expense of the trip, defendant was not compensated in any way, vehicle used was not specially designed to conceal passengers, and no attempt to conceal or harbor the passengers); *Velasquez-Cruz*, 929 F.2d at 424

---

[8] The Tenth Circuit describes "time, place, distance, reason for trip, overall impact of trip, defendant's role in organizing and/or carrying out the trip" as examples of relevant considerations. *Barajas-Chavez*, 162 F.3d at 1289 n.2.

(finding defendant's transportation of illegal aliens was not "merely incidental to her own journey" and thus affirming defendant's conviction for transportation).

The closer question is whether Yang possessed the sufficient intent to further his wife's unlawful presence in the United States. On one hand, like in *Salinas-Calderon*, Yang and his wife individually wanted to travel to Guam to work there. *See* 585 F. Supp. at 602. Further, Yang had a pre-existing relationship with his wife prior to the date of transportation and was not "compensated in any way" by his wife. *See id. But see* USSG § 2L1.1 (decrease levels if offense involved transporting only of the defendant's spouse, child, or both). However, *Salinas-Calderon* is distinguishable in one key respect; while "there was no concealment" in *Salinas-Calderon*, *id.*, a reasonable juror could have inferred that Yang intended to conceal his wife by purchasing a ticket for her to travel from Saipan to Guam by *boat* rather than by *plane*. While there is no regulation or law prohibiting travel from Saipan to Guam by boat, a reasonable juror could have inferred that Yang coordinated and purchased boat passage to Guam for his wife in order to avoid inspection by an immigration officer at the Saipan airport, which is required by federal law, regulation, and agency policy. (Stip. I ¶ 8.) Thus, unlike the car used by the defendant in *Salinas-Calderon* which "was not specifically designed to conceal the passengers," *id.*, the jury here could have inferred that travel by boat from Saipan to Guam is inherently designed to conceal aliens, and that Yang intended to further the unlawful presence of his wife by coordinating and purchasing her travel to Guam by boat. *See also United States v. Georgelos*, 490 F. App'x 915 (9th Cir. 2012) (finding sufficient intent to further when defendant attempted to move individuals to city "where detection by immigration authorities would be much more difficult").

Yang argues there is insufficient proof of intent because there is "more than a reasonable doubt that Mr. Yang's wife was going to remain in Guam unlawfully as opposed to planning to legalize her stay through asylum." (Yang's Mot. 23.) In support of his argument, Yang cites to

*United States v. Dominguez*, wherein the Eleventh Circuit agreed with the defendant that there was insufficient evidence of his intent to further aliens' unlawful presence when he had transported Cuban basketball players from Miami to Los Angeles to "an experienced immigration attorney . . . for the purpose of processing the [aliens] through immigration." 661 F.3d 1051, 1062 (11th Cir. 2011). However, prior to being transported to Los Angeles, the aliens in *Dominguez* "lived freely, openly, and in no way acted in a manner suggesting they were avoiding immigration officials." *Id.* In contrast, Yang concealed his wife's travel to Guam by coordinating and purchasing her passage by boat. Even if Yang intended for his wife to eventually apply for asylum after arriving on Guam, the evidence supports that Yang intended to further his wife's unlawful presence by avoiding detection in order to get to Guam in the first place. The fact that "[g]oing by boat without being noticed was the only way for Mr. Yang to get to Guam" is not a defense. (*Contra* Yang's Mot. 23.)

**b.  Weng did not intend to further another alien's unlawful presence.**

Although the Court has already established that the Government's charge of conspiracy against Weng fails because the evidence does not support a finding by a reasonable juror that she agreed with anyone to transport another alien, the Court also takes this opportunity to discuss whether Weng had the intent to further another alien's unlawful presence. The Court finds that based on the facts in this case, the Government failed to prove beyond a reasonable doubt that she did. As conceded by Weng and discussed *supra* V.A.1.b., the evidence against Weng is entirely consistent with her intent to further only her own unlawful presence and to guarantee her own safe passage to Guam. The evidence against Weng is insufficient to establish beyond a reasonable doubt that Weng contributed to the organization and planning of the trip or intended to further another alien's unlawful presence in any way. *See Velasquez-Cruz*, 929 F.2d at 424 (finding defendant's transportation of illegal aliens was not "merely incidental to her own journey" and

that defendant intended to further other aliens' unlawful presence because there was evidence that she played an organizational role).

### B. Aiding and abetting transportation in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (v)(II)

To prove a defendant guilty of aiding and abetting the illegal transportation of aliens, the government must prove "(1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that someone committed the underlying substantive offense." *United States v. Singh,* 532 F.3d 1053, 1057 (9th Cir. 2008) (quoting *United States v. Gaskins,* 849 F.2d 454, 459 (9th Cir. 1988)). (Weng's Mot. 2–3.)

Drawing all reasonable inferences in favor of the Government, the Court concludes that a rational jury could find that the Government sufficiently proved each element of the aiding and abetting offense as to Defendant Yang, but failed to do so as to Defendant Weng. On the other hand, the aiding and abetting charge against Weng fails because the evidence was insufficient to support a rational jury's finding that Weng intended to further another alien's unlawful presence, as discussed *supra* § V.A.3.b. Accordingly, the Court details its analysis of the aiding and abetting elements as to Defendant Yang only.

### 1. Yang had the specific intent to facilitate the commission of a crime.

In *United States v. Medina* (*Medina II*), the Ninth Circuit found there was sufficient evidence to establish that the defendant intended to facilitate the transportation of aliens when the defendant's post-arrest statement that "he was unaware of the plan to drive to Montana" was contradicted by his co-defendant, "who testified that she had asked [the defendant] to ride with her to Montana, not Yakima." No. 22-30206, 2023 WL 8797503, at *1 (9th Cir. Dec. 8, 2023). Similarly, the district court in *Medina I* had found that the defendant had sufficient intent to

facilitate the offense of transporting illegal aliens and aiding and abetting his co-defendant's commission of that offense because a reasonable juror could have inferred "he had advance knowledge of a plan to transport illegal aliens and intended to assist [his co-defendant] in its completion." 2022 WL 17082148, at *11. No courts in the Ninth Circuit have addressed whether and under what circumstances a transported alien holds the sufficient intent to facilitate transportation of aliens for the purposes of establishing aiding and abetting liability.

In relation to the conspiracy charge, the Court has found there was sufficient evidence for a rational juror to find that Yang agreed with Taitano to commit the offense of transportation of aliens, *supra* § V.A.1.a.; for similar reasons, sufficient evidence established that Yang had the specific intent to facilitate the transportation of another alien——his wife. Yang attended meetings with the intent to gain transport for both himself and his wife to Guam; attended a meeting with Gao, Weng, and Taitano where Taitano agreed to lower the cost of the deposit for both himself and his wife; made depository payments on behalf of himself and his wife on two occasions, knowing that Taitano might use all or part of the amount he paid Taitano on the second occasion to buy a boat; paid Taitano the remaining balance of $5,000 on behalf of himself and his wife once he boarded the boat; and allowed the boat captain to use his phone to call co-conspirators when the boat had run out of fuel rather than call law enforcement. Based on this evidence, a reasonable juror could infer that Yang held the specific intent to facilitate the crime of transporting another alien.

### 2.  Yang intended to further another alien's unlawful presence.

For the reasons explained *supra* § V.A.3.a., Yang held the sufficient intent to further another alien's unlawful presence. Weng did not. *Supra* § V.A.3.b.

//

/

22

### 3. Yang assisted or participated in the transportation offense.

In *Medina II*, the Ninth Circuit found that the defendant assisted in the transportation offense because there was sufficient evidence to "support the conclusion that [the defendant] committed an affirmative act of assistance by providing protection and security to [a co-defendant] while [the co-defendant] transported the aliens." 2023 WL 8797503, at *1 (internal citations omitted). In particular, the Ninth Circuit found 1) a co-defendant testified that she wanted the defendant to accompany her on the trip for protection and security; 2) the defendant never drove but the co-defendant had originally intended for the defendant to assist her in driving and had offered him "an opportunity to make $1,000;" and 3) the defendant had told Border Patrol agents "that he had received a text message from [his co-defendant] 'telling him that . . . she had an opportunity to make some money' and 'that he needed money.'" *Id.* (internal alterations omitted). The district court in *Medina I* had similarly found that the defendant sufficiently aided the transportation, rejecting his argument that he was a "mere passenger." 2022 WL 17082148, at *9. No courts in the Ninth Circuit have addressed whether a transported alien sufficiently assists or participates in the transportation of aliens to establish aiding and abetting liability.

In relation to the conspiracy charge, this Court has found there was sufficient evidence to support the jury's finding that Yang knowingly participated in the conspiracy, *supra* § V.A.2.; for similar reasons, sufficient evidence established that Yang assisted or participated in the transportation offense. Yang met with Taitano on multiple occasions; made payments to her on multiple occasions for himself and his wife, knowing that Taitano might use all or part of the amount he paid on at least one occasion to buy a boat; and allowed the boat captain to use his phone to call Taitano rather than law enforcement once the boat ran out of fuel. These acts sufficiently establishes that Yang took affirmative acts of assistance to a principal of the scheme and was not a "mere passenger." *See Medina I*, 2022 WL 17082148, at *9; *see also*, *United States*

*v. Garcia-Paulin*, 627 F.3d 127, 133 (5th Cir. 2010) (finding "defendant cannot aid and abet only the alien" for violation of § 1324(a)(1)(A)(i)) (citing *Singh*, 532 F.3d at 1059).

### 4. Sablan committed the transportation offense.

The elements of the transportation offense are outlined *supra* § V.A.1. Based on the evidence admitted at trial, a reasonable juror could have concluded that at least Sablan committed the transportation offense. Sablan was hired by Reyes to drive the boat with nine Chinese nationals on board (Stip. II ¶¶ 35, 56); was present at the marina when Yang and Weng paid Taitano thousands of dollars in cash (*id.* ¶¶ 50–51); captained the departure of the boat from Saipan in the evening (*id.* ¶ 56); called Reyes and Taitano rather than law enforcement regarding the boat running out of fuel (*id.* ¶¶ 57, 59); asked Taitano to arrange a delivery of additional fuel (*id.* ¶ 59); and drifted at sea for over fourteen hours before turning on the boat's radio and calling for help (*id.* ¶¶ 58, 63). The Government set forth sufficient evidence to support that Sablan committed each of the elements of the transportation offense.

## VI.    CONCLUSION

For the foregoing, the Court DENIES Yang's renewed Motion for Judgment of Acquittal and GRANTS Weng's renewed Motion for Judgment of Acquittal. In so doing, the jury's verdict finding Yang guilty of conspiracy and aiding and abetting transportation stands. His sentencing set for March 14, 2025 at 9:00 a.m. remains as set. (Order Setting Sent., ECF No. 86 *in* 1:24-cr-00010.) As for the jury's verdict finding Weng guilty of conspiracy and aiding and abetting transportation, the verdict is set aside and a judgment of acquittal shall be entered.

IT IS SO ORDERED this 12th day of February, 2025.

RAMONA V. MANGLONA
Chief Judge

24